Filed 7/26/22

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D078391 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. SCD207640) |
| SADIQ SAIBU, | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of San Diego County, Charles G. Rogers, Judge. Affirmed; remanded with directions.

Summer Stephan, District Attorney, Mark A. Amador, Linh Lam, Valerie Ryan, and Anne Marie Spitzberg, Deputy District Attorneys, for Plaintiff and Appellant.

Rebecca P. Jones, under appointment by the Court of Appeal, for Defendant and Respondent.

In 2008, a jury convicted Sadiq Saibu and Antonio Valentino for their roles in committing a robbery of a video store, two attempted robberies of a liquor store, and a murder and attempted murder in the same liquor store during one of the attempted robberies. Saibu appealed his conviction, arguing, among other things, that the trial court prejudicially erred in failing to instruct the jury with CALCRIM No. 703 with respect to the felony murder

special circumstance allegation.[1]  In the published portion of our opinion, we agreed with Saibu on the jury instruction contention and reversed the jury's true finding on the robbery-murder special circumstance under Penal Code[2] section 190.2, subdivision (a)(17).  (See *People v. Saibu* (2011) 191 Cal.App.4th 1005, 1014.)

In 2019, Saibu filed a petition for resentencing under section 1172.6[3] as to his murder conviction, contending he was not a major participant in the underlying felony murder and did not act in reckless indifference to human life.  The superior court granted the requested relief.

The People appeal, arguing the superior court applied an incorrect legal standard when determining the merits of Saibu's petition.  The People make clear they are not challenging the sufficiency of the evidence but rather are raising a pure legal issue for review.

While this case was pending, our Legislature enacted and the Governor signed into law Senate Bill No. 775 (Senate Bill 775) (Stats. 2021, ch. 551).  Senate Bill 775 amended former section 1170.95 to expand eligibility for resentencing to persons convicted of attempted murder.  As such, we ordered the parties to submit supplemental briefs regarding whether the trial court's finding and order under former section 1170.95 should also apply to the

---

[1]  Valentino also appealed his conviction.  However, he is not a party to this appeal so we do not discuss his previous appeal.

[2]  Statutory references are to the Penal Code unless otherwise specified.

[3]  Saibu brought his motion under former section 1170.95, which was renumbered as section 1172.6 without substantive change on June 30, 2022. (See Stats. 2022, ch. 58 (Assem. Bill. 200), § 10, eff. June 30, 2022.)  As such, we refer to the subject statute by its current number throughout this opinion whenever possible, unless we are discussing substantive legislative changes to former section 1170.95 before it was renumbered as 1172.6.

attempted murder conviction because it arises from the same robbery as did the murder. Both parties submitted supplemental briefs. The People concede that Saibu's conviction for attempted murder is now eligible for resentencing under Senate Bill 775. However, they point out that the parties did not address that issue below (because Senate Bill 775 was not in effect at the time) and argue they should be given the opportunity to present additional evidence and argument to show Saibu is guilty of attempted murder after changes to the felony murder law. In contrast, Saibu argues that we should find he is entitled to relief under section 1172.6 based on the superior's court's finding that he did not act with reckless indifference to human life.

Regarding the superior court's determination that Saibu is entitled to relief under section 1172.6 as to his murder conviction, we determine, on the record before us, the People cannot show that the court committed reversible legal error. As such, we affirm the order. However, we are hesitant to extend the superior court's finding on the murder offense to the attempted murder offense even though both offenses are based on the same robbery. The People represent that they would have emphasized other evidence in the record relevant to the attempted murder offense that was not pertinent to the murder conviction. We believe the People should have the opportunity to present such evidence to the superior court. As such, we remand this matter back to the superior court with instructions to issue an order to show cause (OSC) and hold an evidentiary hearing regarding whether Saibu is entitled to relief under section 1172.6 as to his attempted murder conviction. We offer no opinion regarding the results of that hearing. That said, because we are affirming the superior court's finding that Saibu is entitled to relief pursuant to section 1172.6 for his murder conviction, that issue may not be reargued

3

below, and the court's findings as to that issue may not be challenged as part of the new section 1172.6 hearing. (See *People v. Gray* (2005) 37 Cal.4th 168, 196-197.)

FACTUAL AND PROCEDURAL BACKGROUND[4]

"A. *Factual background*

"During the summer of 2005, Saibu and Valentino spent time with [R.J.], [K.C.], [K.C.'s] girlfriend [R.K.], [D.C.] and [K.B.] at [R.J.'s] mother's home on Clay Street in southeast San Diego.

"1. *The July 7, 2005 Hollywood Video store robbery* (*counts 6 & 7*)

"At approximately 9:45 p.m. on July 7, 2005, two African-American men wearing hooded sweatshirts entered a Hollywood Video store on El Cajon Boulevard. One man was wearing a gray sweatshirt, and the other was wearing a black sweatshirt. Both men covered the lower portions of their faces with black bandanas. Shift leader [T.O.] was working near the entrance of the store that night. As the two men entered the store, [T.O.] turned to greet them. After she turned away, she heard one of the men shout, 'Everyone get down. This is a robbery.'

"The man who was wearing the gray hooded sweatshirt had darker skin than the other man and was carrying a shotgun. The man with the

---

[4]     At the evidentiary hearing regarding Saibu's petition for resentencing, the superior court admitted into evidence the clerk's transcripts and the reporter's transcripts, which were part of the record before this court in *People v. Saibu*, *supra*, 191 Cal.App.4th 1005. The court also received into evidence the postconviction proceedings, the direct appeal, and further proceedings based on the direct appeal. Moreover, at the evidentiary hearing, the parties did not offer live testimony. Instead, they referenced evidence that the court had admitted and made arguments based on that evidence. To provide context here, we repeat the statement of facts from the unpublished portion of *People v. Saibu*. However, we have used initials for some third parties in an effort to preserve their privacy.

4

shotgun said something like, 'I don't want to have to kill someone tonight,' or 'Am I going to have to kill anybody today?' The man in the black sweatshirt had a pistol and a black duffel bag. The man in the black sweatshirt went to the register and told [T.O.] to '[h]urry up' and '[g]ive [him] the money.' [T.O.] gave the man approximately $75 from the register. Another employee, [J.C.], emptied another register and put the money in the duffel bag that the man in the black sweatshirt was carrying.

"[M.G.] worked at the Hollywood Video store in an area of the store called Game Crazy. Game Crazy closed at 10:00 p.m., although the rest of the store remained open until midnight. [M.G.] was preparing to close Game Crazy when he heard someone yelling. [M.G.] saw a man wearing a gray hooded sweatshirt and holding a shotgun inside the store. That man told [M.G.] not to play around or mess with him. Based on the man's voice, [M.G.] believed that the man was African-American. [M.G.] gave the man approximately $650, which was the money for the night deposit from the Game Crazy register.

"[A.R.] and [S.J.] lived in an apartment located across the alley behind the Hollywood Video store. On the night of the robbery, they were moving out of their apartment. [A.R.] was driving a U-Haul truck down the alley intending to back the truck into the driveway of the apartment when he saw two individuals who were wearing baggy clothes—including hooded sweatshirts—looking into the Hollywood Video store. As [A.R.] was watching the men, they turned the corner and disappeared.

"[S.J.], who had just driven her car through the parking lot of the Hollywood Video store, drove into the alley and parked her car across the alley from the U-Haul truck. She heard someone yelling and then saw two men holding guns, running down the alley. The men had their hoods pulled

5

up over their heads, partially concealing their faces.  However, the lighting in the alley was good, and Jenkins could see the top portions of the men's faces.  She believed that both men were African-American.

"[A.R.] also saw the men running through the alley.  The men were wearing bandanas and holding guns.  The men ran 'full speed' toward the U-Haul truck, and then ran through the small space between the truck and the apartment building.  The men continued running to the end of the alley and turned right at the street.  [A.R.] and [S.J.] ran into their apartment and did not go back outside until they saw that police officers had arrived.

"The Hollywood Video store had five surveillance cameras.  San Diego police officers arrived at the store a few minutes after the robbery.  [T.O.] provided the surveillance video of the robbery to Detective Ronald Hall.  The video was played for the jury at trial.  [T.O.] testified that the surveillance video accurately depicted the robbery.

"2.    *The July 12, 2005 T&M Liquor store attempted robbery* (*count 5*)

"At approximately 11:15 p.m. on July 12, 2005, [F.M.] was counting money and preparing the register receipts at the front counter of the T&M Liquor store, which is located on El Cajon Boulevard in the City Heights area of San Diego.  [F.M.'s] girlfriend, [P.V.], was standing at the counter talking to [F.M.], waiting for him to close the store.

"[F.M.] saw a man wearing a black hooded sweatshirt with the hood over his head and a bandana covering his nose and mouth.  The man pointed a shotgun at [F.M.'s] face and yelled for [F.M.] to 'give him the money.'  The man also pointed the gun at [P.V.] and directed her to 'get down' and not to move.  [P.V.] could see the man's face and could tell that he was a dark-skinned African-American.

6

"[F.M.] grabbed the money out of the register and threw it on the counter. The man told [F.M.] to put the money in a bag. As [F.M.] reached for a bag, he pressed the silent alarm button.

"[A.G.] was in the cooler at the back of the store when he heard a man yelling. [A.G.] heard the man say, 'Put the money in the bag or I'm going to blow your head off,' or something similar to that, and he concluded that 'it was like a holdup.' [A.G.] started running toward the front of the store and saw a man pointing a shotgun at [F.M.]

"[A.G.], who is in his 50's and is five-feet-four inches tall, came up behind the man and grabbed the man's elbows. The man was stiff and holding the gun high and close to his body. [A.G.] was able to lift the man about three or four inches off the ground and turn the man's body, and the gun, away from [F.M.] and [P.V.] [A.G.] and the man both fell to the floor, and [A.G.] landed on top of the man. The force of hitting the floor knocked the shotgun out of the man's hands and it slid away from both of them. The man struggled to get out from underneath [A.G.], who was attempting to hold him down. The man eventually was able to get up and run out the door.

"[A.G.] retrieved the shotgun and ran after the man. When the man was approximately two or three feet away from the alley, [A.G.] pointed the gun at him and pulled the trigger. The gun did not fire, and a shell was ejected from the chamber. [A.G.] watched the man run into the alley, but decided not to follow him and instead ran back to the liquor store.

"Officers patrolling the area received a call about the robbery at 11:17 p.m. and arrived on the scene at 11:20 p.m. [A.G.] showed officers the shotgun, which at this point was on the floor behind the front counter. [A.G.] also directed the officers to the shotgun shell that was ejected when he attempted to fire the gun at the robber. Officer David Yu collected the rifle,

the six shells inside the rifle, and the shell that had been ejected outside the store.

"Detective Eugene Bojorquez collected surveillance video of the attempted robbery from the liquor store's security camera. The video was played for the jury at trial. [P.V.] testified that the video accurately reflected the incident.

"On April 4, 2007, [F.M.] attended a live lineup. Each of the men in the lineup held a shotgun and said, 'Give me the 'F' money.' [F.M.] identified the men in positions three and four as sharing some similarities with the suspect from the July 12, 2005 incident. However, [F.M.] said that the man in position number four did not have the dark skin tone of the suspect, while the skin tone of the person in position three matched the skin tone of the robber. That man's eyes and nose also looked familiar to [F.M.] The man in position number 3 was Saibu.

"The shotgun and shotgun shells that police recovered from the scene were tested for DNA. The lab technician determined that Saibu was a major contributor of the DNA that was found on the textured areas and on the trigger of the shotgun.

"3.    *The July 13, 2005 T&M Liquor store murder, attempted murder and attempted robbery* (*counts 1, 2 and 3*)

"At approximately 8:00 a.m. on July 13, 2005, [L.T.] drove his white Mercedes Benz to the auto repair shop that he owns in Lemon Grove. [L.T.] parked the car in front of the shop and left the keys in the car. At around 11:00 a.m., [L.T.] noticed that his car was gone.

"[L.T.] had seen Valentino with another customer at the repair shop the day before his car was stolen. The auto repair shop was located

8

approximately a block and a half from the Value Inn Hotel, where Valentino had been staying.[5]

"That day, [A.M.] was sleeping on the couch of an apartment that she shared with her brother, [N.A.], when Saibu, who is her cousin, came to the apartment. Saibu was being very loud and woke her up. Between 1:30 p.m. and 3:30 p.m., [A.M.] telephoned [N.A.] to tell him that Saibu had come over to the apartment and that he had gone into [N.A.'s] bedroom.

"Later that afternoon, [L.T.'s] white Mercedes was used in an attempted robbery at the T&M Liquor store. Store manager [W.Y.] was sitting behind the counter at the cash register talking with his friend and candy, cigar and cigarette vendor, [D.T.], who was standing on the customer side of the counter near the entrance to the store. At approximately 3:40 p.m., a man wearing dark clothing, a bandana on his face, and a hooded sweatshirt with the hood over his head walked into the liquor store. The man pointed a silver revolver at [W.Y.] and said, 'Give me the money.' [W.Y.] could see the man's face from the middle of his nose to his eyes. Based on the portion of the man's face that he could see, as well as the tone of the man's voice, [W.Y.] thought that the man was African-American and about 19 to 21 years old.

"[W.Y.] told the man to calm down and tried to open the cash register. The man said, 'Give me the money' several times, and [D.T.] turned in reaction to the man's loud voice. The man then shot [D.T.] in the chest from less than five feet away. [D.T.] appeared surprised and tried to back away from the man. The man walked toward [D.T.] and, as [D.T.] fell to the floor, shot him again.

---

5    "While in jail, Valentino talked on the telephone with his mother, who said to him, 'They said that your prints were in that Mercedes . . . that was stolen from across the street from that motel you were staying at.'"

"While the man was shooting [D.T.], [W.Y.] pressed the silent alarm button. The man then walked toward [W.Y.], who was ducking behind the counter. The man looked over the counter and fired two shots in [W.Y.'s] direction. Neither bullet hit [W.Y.]. The man then ran out of the store without taking any money.

"[W.Y.] grabbed a gun that was in a drawer behind the counter and went to check on [D.T.] [D.T.] was bleeding from his mouth and indicated to [W.Y.] that he could not breathe.

"At 4:45 p.m., San Diego Police Officers Jason Scott and Thomas Seiver separately responded to a call regarding the shooting at the liquor store. Scott arrived to find [W.Y.] with blood on his hands, arms, and shirt, saying, 'He shot him.' Someone told Scott that the suspect had run out of the store and had turned southbound in the alley.

"Both of the police officers attempted to aid [D.T.] by administering CPR. [D.T.] was not breathing and did not have a pulse. Emergency medical personnel arrived at the liquor store and determined that [D.T.] was dead. [D.T.] died from gunshot wounds to his shoulder and torso. A bullet was recovered from his body during an autopsy. Officers also recovered two other bullets from the scene of the shooting.

"Officer Scott viewed surveillance video from the liquor store and broadcast a description of the shooting suspect to police officers in the area. The surveillance video was played for the jury. [W.Y.] testified that the video accurately reflected the events that he witnessed that day.

"[M.M.] lived in an apartment located about two blocks from the T&M Liquor store. [M.M.] was standing in the alley behind her apartment waiting for her mother when she saw a white Mercedes Benz in the alley. The driver of the Mercedes drove toward her and parked. Two African-American men

10

got out of the car and started to change clothes, which [M.M.] thought was suspicious. The passenger had lighter skin than the driver. The passenger removed what looked like black tights from his head. When he removed the tights, [M.M.] could see that he had curly hair. Both men walked away from the car in the alley wearing dark clothes. Police later lifted Valentino's left palm print and right palm print from the trunk of the Mercedes.

"That day, [M.M.] attended two live lineups, but was unable to identify anyone. However, in court, [M.M.] identified Valentino as the passenger of the white Mercedes. Although his hair was shorter and in braids at trial, she recognized his build, height, and the portion of his face that she had seen on the day of the shooting.

"[N.A.] testified that he clocked out from his job at a Longs Drug store on July 13, 2005 at 10:30 p.m. He went home and saw the news on television. [N.A.] saw a video clip about the shooting at the T&M Liquor store and [R.T.'s] murder.[6] [N.A.] knew [R.T.], and was familiar with the liquor store, which was located two blocks from his apartment.

"[N.A.] testified that he thought it was possible that a .38-caliber pistol that he had purchased from a coworker had been used in the shooting. [N.A.] explained that he thought the gun might be his because his sister had called him and told him that Saibu had visited their apartment and gone into [N.A.'s] bedroom, where [N.A.] kept the gun, the gun in the video was the same caliber as his gun, and the number of shots that had been fired at the liquor store was the same as the number of bullets that were in the gun. [N.A.] looked on the internet for video of the shooting, and then looked for his .38-caliber pistol in his bedroom. He was unable to find the gun.

---

6  "The San Diego police department did not provide a copy of the surveillance videotape of the T&M Liquor store shooting to television stations until the following day."

11

"That night, [N.A.] had a telephone conversation with Saibu during which he asked Saibu, 'That wasn't you right?' Saibu answered, 'No, it wasn't me but . . . .' [N.A.] asked Saibu, 'Were you famous[?]' Saibu responded, 'Maybe.' 'Why are you asking?'

"In late December 2005, the coworker from whom [N.A.] had bought the pistol received a telephone call from [N.A.]. [N.A.] asked the man if he was watching the television program 'America's Most Wanted.' The coworker replied that he was not. [N.A.] then told the man that the gun the man had sold to [N.A.] had been used in a robbery. [N.A.] said that his cousin had come to his house to get the gun, and that the gun had been used to kill someone. The coworker told detectives that [N.A.] had told him that after the robbery his cousin had taken the gun to Florida and that everything was 'okay.'

"4.     *The uncharged August 29, 2005 Wells Fargo Bank robbery*

"On August 29, 2005, at approximately 9:40 a.m., three African-American men wearing hooded sweatshirts and bandanas over their faces entered the Wells Fargo Bank on Black Mountain Road in San Diego. Witnesses saw three weapons—a shotgun, an assault rifle, and a machine gun pistol. Photographs taken from surveillance video at the bank showed one man holding a black duffel bag and wearing black clothing and black gloves, and another man pointing a weapon.

"The men yelled that it was a robbery and ordered the customers and bank employees to the ground. Two of the men jumped over the counter and demanded money from the bank employees. The men grabbed money from two teller drawers, and then ordered several employees into the vault area in the back of the bank. One of the men pointed a gun at an employee and demanded that she open the vault. After the employee opened the vault, the

12

men took money from inside the vault and put it into the black duffel bag. After the men got the money from the vault and the teller drawers, they ran out of the bank.

"The men ran to a waiting silver vehicle that was parked in front of the bank. That vehicle had been reported stolen the day before by the owner, who had left the key in the ignition while he went into a store. The location where the vehicle had been stolen was a few blocks away from where [K.C.] and [R.J.] lived, i.e., the home where Saibu and Valentino had been hanging out that summer. Police officers eventually recovered the vehicle about three or four blocks away from the bank.

"A witness who was driving on Ricker Road noticed two men, dressed all in black, running from a silver vehicle and getting into a red vehicle. The witness thought that these circumstances were suspicious, so he wrote down the license plate number of the red vehicle. Police traced ownership of the red vehicle to [R.K.], who was [K.C.'s] girlfriend.

"Police interviewed [R.K.], and subsequently conducted a search of [D.C.'s] home, where they recovered weapons.

"Federal Bureau of Investigation Special Agent David Eaton testified that Saibu and Valentino had been identified as two of the three men who robbed the Wells Fargo Bank, and that both had been tried and convicted for that robbery. [K.B.] was also considered a person of interest in the Wells Fargo Bank robbery.

"5.     *[K.B.'s] plea agreement and testimony*

"[K.B.] was arrested on September 8, 2005, along with Valentino, and was charged with bank robbery. [K.B.] was a friend of Valentino's and knew Saibu. [K.B.] testified for the prosecution in this case, pursuant to plea agreement. He identified both Saibu and Valentino in court.

13

"According to [K.B.], Valentino often stayed at the Value Inn in Lemon Grove. [K.B.] worked at an adult bookstore located near the Value Inn. Valentino would visit [K.B.] at the bookstore.

"[K.B.] was tried with Saibu and Valentino on charges related to the Wells Fargo Bank robbery. During that trial, [K.B.] participated in a 'free talk' that was attended by the prosecutor, Detective Anthony Johnson (who was investigating the T&M Liquor store murder), and [K.B.'s] defense counsel. [K.B.] disclosed information that he knew about the T&M Liquor store murder, with the understanding that the information would not be used unless [K.B.] agreed to cooperate with the prosecutor. [K.B.] originally decided not to cooperate, and did not testify against Saibu or Valentino in the trial of the Wells Fargo robbery. At the conclusion of that trial, the jury convicted Saibu and Valentino, but was unable to reach a unanimous verdict as to [K.B.]. [K.B.] was ordered to return for retrial.

"In March 2007, [K.B.] reached an agreement with the prosecutor to testify in this case. [K.B.] pled guilty to robbery with the use of a firearm for his role in the Wells Fargo Bank robbery. After [K.B.] provided testimony at the preliminary hearing in this case, he was sentenced to three years in state prison.

"[K.B.] testified about a conversation that he had with Valentino regarding the T&M Liquor store shooting. Valentino had picked up [K.B.] from [R.J.'s] house and the two went to a car wash. Valentino asked [K.B.] if he had heard anything about robberies that had taken place in the area. Valentino told [K.B.] that [K.B.] could not tell anyone about what Valentino was going to say.

"Valentino proceeded to tell [K.B.] that he had robbed a store and just 'shot the guy's head off with the gauge.' Valentino said that the shooting had

14

taken place on El Cajon Boulevard. Valentino was angry because they were supposed to get $50,000 from the robbery, but ended up not getting any money.

"Approximately a week after this conversation, [K.B.] went to [R.J.'s] house to talk with Saibu and Valentino about participating in a robbery with them. Saibu was planning the robbery, and [K.B.] was going to be the driver. [K.B.] heard Saibu say to Valentino, 'Man, . . . I just told you to rob the place. I didn't know you [were] going there to shoot the guy['s] head off.' Valentino responded, 'Man, don't talk about that,' and then walked out of the room.

"While awaiting trial in the Wells Fargo Bank robbery case, [K.B.] spoke with Saibu while they were being detained together in the same jail cell. [K.B.] told Saibu that his lawyer had allowed him to see videotapes of the robberies and the shooting at the T&M Liquor store. [K.B.] mentioned that he had seen the gray BMW, and Saibu responded that the car that was used was not a gray BMW, but rather, a white Mercedes.

"At the trial in the present case, [K.B.] viewed the surveillance video of the Hollywood Video robbery. [K.B.] had seen this video during his initial 'free talk,' and had told the detective that the man wearing the gray hooded sweatshirt was built like Saibu. [K.B.] believed that the other man was Valentino. According to [K.B.], at the time of the robbery of the Hollywood Video store, Valentino had long, black curly hair, which was pushing up the hood of Valentino's sweatshirt.

"[K.B.] also viewed video of the July 12 attempted robbery of the T&M Liquor store. Prior to trial, [K.B.] had told detectives that the robber could have been either Saibu or Valentino, but said that the man had the same body type as Saibu and was wearing clothing that [K.B.] had previously seen Saibu wearing.

15

"[K.B.] viewed video of the July 13 shooting, as well. [K.B.] testified that he had told the detective, during his 'free talk' interview, that the man in that video had lighter skin than the man who attempted to rob the same store the day before, and that the man's skin tone and complexion matched Valentino's.

"6. *[R.K.'s] plea agreement and testimony*

"[R.K.] agreed to cooperate with the prosecution in the bank robbery case, and agreed to provide testimony in the T&M Liquor store shooting case. [R.K.] received a four-year prison sentence in exchange for her cooperation.

"[R.K.] met Saibu and Valentino through her ex-boyfriend, [K.C.] [K.C.] lived at [R.J.'s] mother's house during the summer of 2005. [R.K.] and a group of people including [R.J.], [K.C.], [D.C.], [K.B.], Valentino, and Saibu would hang out at that house, watch television, play video games, drink alcohol, and smoke marijuana.

"[R.K.] agreed to be the getaway driver for the Wells Fargo Bank robbery. That day, she drove her car to an apartment complex to pick up Saibu. Saibu was carrying a bag with guns in it, which he placed in the trunk. [R.K.] and Saibu then drove to [D.C.'s] house, where Valentino eventually arrived in a stolen car. Valentino said that he had waited for someone to leave the keys in the ignition so that he could steal a car. The men moved the bag of guns from [R.K.]'s car to the stolen car. The men then got into the stolen car, and [R.K.] followed them to the bank. [R.K.] parked her car and waited for the men to rob the bank. About 10 to 15 minutes later, the men returned and took off their bandanas before getting into [R.K.]'s car."

B. *Procedural Background*

On January 9, 2019, Saibu filed a petition for rehearing under section 1172.6 to vacate his murder conviction. On August 5, 2020, Judge

16

Charles Rogers, who presided over the original jury trial in this case, issued an order to show cause (OSC).

On September 25, 2020, the court set an evidentiary hearing for November 18, 2020. The People filed a return on November 1, 2020, arguing Saibu's murder conviction should be upheld.

At the evidentiary hearing, the parties did not offer any live testimony. As evidence, the People submitted the record of conviction, our previous opinion in Saibu's direct appeal, the order on Saibu's federal petition for a writ of habeas corpus, the order on Saibu's state petition for a writ of habeas corpus, the OSC why resentencing should be granted, and the OSC volume one. The People also included all exhibits that were admitted at Saibu's trial.

The court then explained how it would consider the evidence:

> "What I'm going to do then is receive into evidence for this proceeding the trial record in this case. This includes the clerk's transcripts, all volumes, and the reporter's transcripts. Therefore, the evidence before me will be the evidence that was adduced at trial.

> "With respect to this case, as the People's pleadings point out, there were some post-conviction proceedings, including, of course, the direct appeal, and then some further proceedings in this court based on the direct appeal. I think those are properly part of the record of conviction, and I will receive them. But I am not—I think we may have a difference of opinion as to what the Court can rely upon.

> "If—and perhaps I'm being premature. This will be subject to what you argue. It would seem to me that the recital—a Court of Appeal opinion does not find facts. It recites facts most favorably to uphold the judgment based on the issues raised by an appeal.

> "So in this Court's view, nothing that the Court of Appeal does that does not establish something as a matter of law or a matter of fact is actually considered evidence. What I

17

will propose to do, therefore, is receive the clerk's transcript, the reporter's transcript, the exhibits. And I will allow counsel to argue from the Court of Appeal opinion or the habeas proceedings as you see fit, understanding that this Court does not view those necessarily as qualifying evidence. So that will be the record upon which we decide this."

The People argued that the court could use our opinion on Saibu's direct appeal as an "official record[ ], especially for the timing and the entry of decision that were made within the appellate record." In response, the court explained:

"In my view, to the extent that the record, for example, might show that these were the instructions that were given or that this occurred on this particular date, all of those non-hearsay facts I think are properly before the Court. To the extent that we're talking about conclusions that were drawn but weren't made as a matter of law or by the jury, a jury finding, I think the result is otherwise.

"But, yes, I agree with you that the Court can take notice of those discrete things that are non-hearsay that are contained in the record."

The People then argued they had "narrowed the argument . . . down to two essential components[:]" (1) whether Saibu was a major participant in the murder as defined in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and (2) did Saibu act with reckless indifference to human life as set forth in *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). The People emphasized that the court must consider "the totality of the circumstances" "in the weighing and balancing of the factors under major participant and reckless indifference category."

The People further asserted that the court should consider that Saibu was involved in a series of robberies with each one involving Saibu arming himself or others to take money by force. They contended Saibu endorsed "a

18

series of crimes in which you have got dangerous people with dangerous weapons doing dangerous things[.]" To this end, the People pointed out that there was evidence introduced at trial proving Saibu was the "mastermind" behind the robberies. Also, the People emphasized that Saibu had attempted to rob the same liquor store the night before the victim was murdered by Valentino. Thus, Saibu was aware that people would be at the liquor store at the time of the second attempted robbery and that at least one of them might resist.

In addition, the People noted that Saibu secured a gun and ammunition that Valentino used to try to rob the liquor store and ultimately kill the victim. They also highlighted that Saibu played a role in the stealing of a car to be used for the robbery. And the People observed that Saibu knew that Valentino "had engaged in other violent crime because they did it together."

Also, the People argued that, after Valentino shot the victim and left the liquor store, Saibu only assisted Valentino and did nothing to assist the victim. Further, they insisted that Saibu later increased the level of danger in his subsequent robberies, emphasizing that Saibu and Valentino were both armed when they attempted to rob a bank. Finally, the People contended that the evidence showed that Saibu acted with reckless indifference to human life.

In response, Saibu's counsel argued that "[p]lanning to rob is not the same as planning to murder someone." To this end, defense counsel noted that robbery "includes force, fears, threats of fear, the use of force. It is inherently dangerous. And in order to find that Mr. Saibu was a major participant or acted with reckless indifference to human life, we need find much more than the danger that is inherent in the crime of robbery." She also argued that the People had to prove beyond a reasonable doubt that the

19

attempted robbery that led to the murder was "more than your average" robbery and "that the risk to death was enhanced and surpassed the inherent risks."

Saibu's counsel maintained that under the factors set forth in *Banks*, *supra*, 61 Cal.4th 788 and *Clark*, *supra*, 63 Cal.4th 522, Saibu could not be convicted of murder. She pointed out that the robberies committed before and after the murder at the liquor store indicated that Saibu was not a major participant in the murder. In support of her position, counsel emphasized that the events during the attempted robbery of the liquor store that led to the murder "were unlike any of the other robberies that had occurred before or after the murder." Moreover, Saibu's counsel contrasted the planning of the robbery (including the stealing of a car and procuring of a firearm) with the "rash, impulsive, and unplanned" shooting of the victim. Counsel further emphasized that in none of the previous robberies or attempted robberies did Saibu commit any acts of violence. He might have been armed and threatened violence, but he did not harm anyone. Specifically, Saibu's counsel underscored that, the night before the murder when Saibu attempted to rob the liquor store by himself, when Saibu faced resistance, he ran. Counsel claimed Saibu's running away and failure to reengage in a physical confrontation or rearm himself proved that Saibu only wanted to rob the liquor store. His "plan was never to harm anyone. The plan was to get money."

Finally, Saibu's counsel brought to the court's attention that shortly after Valentino killed the victim, Saibu said to him, " 'I told you to rob the guy, not blow his head off,' or 'I didn't know you were going to blow his head off.' "

In rebuttal, the People argued, in part, as follows:

"Your Honor, when we look at the totality of Mr. Saibu's conduct before and after the crime, all of which the Court has deemed relevant and which a jury would have been able to consider, it is very clear that he is a major participant. I think it is unquestionable that he is a major participant.

"When we get to reckless indifference, because there are some factors which he doesn't meet head-on, specifically presence at that the scene, you know, we look a little more carefully.

"But I think that this Court would acknowledge that had a jury been presented with the appropriate jury instruction for major participation at the time of Mr. Saibu's trial, they absolutely would have found to be truth.

"When you look at this conduct, his role in it, his complete lack of regard for human life, the fact that he is a person, when he commits robberies himself, goes in threatening to kill people, pointing weapons in their faces, putting them into the zone of danger, as the Court called it, the violence was not an issue for him. The violence was part of the excitement.

"And this is a situation that is not comparable to these one-off armed robberies where somebody is the getaway driver and they don't know what is going on or somebody really had no way to believe that something this dangerous can happen.

"If the Court looks at the criteria that is required, I think the Court can find both using the substantial evidence standard, as well as the beyond a reasonable doubt proof to the Court itself as factfinder standard that Mr. Saibu meets the criteria under the new law and that his sentence should remain intact."

After the parties submitted, the court indicated that it believed subdivision (d)(3) of section 1172.6 requires the People to prove that Saibu is

21

guilty of murder beyond a reasonable doubt after the change in law.[7] The court noted that it had to evaluate the evidence against the "whole mix of factors" and specifically referenced the factors from *Banks* and *Clark*. Then the court addressed the various factors.

The court observed that when the killing occurred, Saibu was not inside the liquor store. He did not have the gun (although he helped to procure it). Instead, Saibu was sitting in the alley in a stolen car waiting while Valentino entered the store to commit the robbery. The court also noted that when Saibu tried to rob the store the previous night, he was unsuccessful. He was disarmed, and he fled. The court emphasized that Saibu did not try to shoot anyone with his gun.

The court also addressed the People's assertion that the other robberies proved that Saibu was a major participant and exhibited reckless indifference sufficient to convict him of murder based on the liquor store killing. To this end, the court noted the People's "good advocacy" in emphasizing the "kinds of threats and things that were said during those robberies," but the court commented "that is what armed robberies do. People use threats to kill people to try to get compliance." The court further explained that it did not believe that Saibu's "role in other robberies where he was actively at the scene of the robbery with a gun and doing the robbing, I don't think has much relevance to this case where he wasn't there inside with the gun doing the robbing."

---

[7] Below, the People argued the superior court should apply a substantial evidence review of the record to determine if Saibu was guilty of murder. Saibu argued the People needed to prove his guilt beyond a reasonable doubt. The People do not challenge this determination on appeal, and even if they did, such an argument would not be successful. (See § 1172.6, subd. (d)(3).).

In addition, the court addressed the question of reckless indifference. The court clarified:

> "And I think that the question of his reckless indifference must focus on the circumstances of this robbery. It is not a question of whether he intended a robbery would occur. I think he did. He helped steal the car, I think, and drove them there and was waiting outside and all the other factors that [the People] cite[ ].

> "But in terms of his actions, we have to look at his actions as to what he did in this particular robbery. And I think that the inferences, with due respect, [the People] draw[ ] are too broad in terms of imputing Mr. Valentino's intent and conduct and reckless indifference and indeed, I think, intent to kill when things went bad.

> "We can't impute all that to Mr. Saibu. I understand they were friends. I understand they had done a number of robberies together. I understand the circumstances before and after. But it goes beyond a reasonable inference and becomes speculation to impute all that to Mr. Saibu.

> "The question is whether Mr. Saibu entertained the requisite mental state which must be that he knowingly engaged in criminal activities known to carry a grave risk of death. He must be aware and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death that his or her actions create. And I don't find that to be the case with respect to Mr. Saibu with respect to this robbery."

The court subsequently emphasized:

> "I find and conclude that the record and the evidence before the Court at this time does not establish beyond a reasonable doubt that Mr. Saibu acted with reckless indifference. It is a closer call as to whether he was a major participant. And I will assume, without finding that he was, but even so, I think the evidence falls short of proving that he acted with reckless indifference."

The court thus granted Saibu his requested relief under section 1172.6. The People timely appealed.

## DISCUSSION

### A. *General Legal Background*

On September 30, 2018, the Governor signed Senate Bill No. 1437 (Senate Bill 1437). "The legislation, which became effective on January 1, 2019, addresses certain aspects of California law regarding felony murder and the natural and probable consequences doctrine by amending Penal Code sections 188 and 189, as well as by adding Penal Code section [1172.6], which provides a procedure by which those convicted of murder can seek retroactive relief if the changes in law would affect their previously sustained convictions." (*People v. Martinez* (2019) 31 Cal.App.5th 719, 722; see *People v. Gentile* (2020) 10 Cal.5th 830, 842-843.)

Section 1172.6, subdivision (c) provides: "Within 60 days after service of a petition that meets the requirements set forth in subdivision (b), the prosecutor shall file and serve a response. The petitioner may file and serve a reply within 30 days after the prosecutor's response is served. These deadlines shall be extended for good cause. After the parties have had an opportunity to submit briefings, the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief. If the petitioner makes a prima facie showing that the petitioner is entitled to

24

relief, the court shall issue an order to show cause. If the court declines to make an order to show cause, it shall provide a statement fully setting forth its reasons for doing so."

Moreover, section 1172.6, subdivision (d)(3) sets forth the burden of proof and the evidentiary rules to be followed by the court if the court grants an OSC and holds an evidentiary hearing:

> "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens. A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges."

Here, the court issued an OSC and held an evidentiary hearing. At that hearing, the court determined that the People did not carry their burden

to prove that Saibu was guilty of murder beyond a reasonable doubt under the applicable changes in the law.

B. *Appealability*

As a threshold issue, Saibu contends the order granting the petition is not an order the People are statutorily entitled to appeal. In addition, Saibu asserts the instant appeal violates double jeopardy. The People contend this order is appealable under section 1238, subdivision (a)(6) as an order modifying the verdict as well as under subdivision (a)(8) as an order dismissing or otherwise terminating all or any portion of the action including such an order or judgment after verdict or finding of guilty.

"The People's right to appeal is statutory, and appeals that do not fall within the exact statutory language are prohibited." (*People v. Salgado* (2001) 88 Cal.App.4th 5, 11 (*Salgado*).) The statutory circumstances permitting the People's appeal are specified in section 1238. (*People v. Chacon* (2007) 40 Cal.4th 558, 564.) Section 1238, subdivision (a)(6) permits the People to appeal from "[a]n order modifying the verdict or finding by reducing the degree of the offense or the punishment imposed or modifying the offense to a lesser offense." (§ 1238, subd. (a)(6).) Here, Saibu successfully petitioned the court for resentencing under section 1172.6. At that time, subdivision (e) of former section 1170.95 provided that when a petitioner is entitled to relief and where " 'murder was charged generically, and the target offense was not charged, the petitioner's conviction shall be redesignated as the target offense or underlying felony for resentencing purposes.' " (*People v. Howard* (2020) 50 Cal.App.5th 727, 737.)[8] In granting the petition, the court thus modified Saibu's original verdict and reduced the

---

[8] Subdivision (e) of the newly renumbered section 1172.6 now applies to both murder and attempted murder. (See 1172.6, subd. (e).)

murder conviction to a lesser offense. Nevertheless, Saibu argues that there are no lesser offenses for felony murder. Further, Saibu points out that felonies creating the basis for a felony murder prosecution are not lesser included offenses. (See *People v. Bradley* (2021) 65 Cal.App.5th 1022, 1039-1040.) Yet, *Bradley* is not helpful to Saibu here because that case concerned whether the trial court erred in declining to give a jury instruction about robbery as a lesser included offense of felony murder. *Bradley* did not involve a defendant successfully petitioning a trial court to be resentenced under section 1172.6.

There is no limitation in subdivision (a)(6) of section 1238 that the People may only appeal from reductions to lesser included offenses. (See *People v. Statum* (2002) 28 Cal.4th 682, 692 (*Statum*) [holding that section 1238, subd. (a)(6) authorizes the People to appeal a trial court's order reducing a wobbler to a misdemeanor].) Indeed, our high court has explicitly rejected such an argument. (*Statum*, at p. 692.) Therefore, it follows that if a court erroneously grants a section 1172.6 petition, the People have a right to appeal that order because it modifies the original verdict and reduces it to a lesser offense and, consequently, reduces the punishment imposed.

Also, we are not persuaded by Saibu's reliance on *People v. Rivera* (1984) 157 Cal.App.3d 494 (*Rivera*). Based on that case, Saibu argues that the superior court here did not issue an order but rather entered a new judgment that is not appealable as an order after judgment. The statutory resentencing scheme at issue in *Rivera*, under section 1170, former subdivision (f)(1), did not require a multi-step process in the trial court, including an initial finding of eligibility (unlike section 1172.6). Instead, in *Rivera*, the initial determination of eligibility for resentencing was made by the Board of Prison Terms referring a case back to the trial court because the

sentence imposed was "disparate in comparison with the sentences imposed in similar cases." (*Rivera*, at p. 496, fn. 1.)  Upon receiving that referral from the Board of Prison Terms, the trial court "scheduled a hearing, recalled the previously ordered sentence and commitment order, and resentenced" the defendant.  (*Id.* at p. 496.)  Importantly, there was no order of the trial court before the resentencing; rather, as required by the statute, the court simply recalled the initial sentence and resentenced defendant.  The sentence imposed at the resentencing thus became the judgment.  (*Id.* at p. 497.)  That is, the appeal was, in effect, an appeal from the judgment, not from an order after judgment and as such, was not permitted under section 1238, subdivision (a)(6).  (*Rivera*, at p. 498.)

Moreover, in *Rivera*, the substance of the appeal was directed at the resentencing decision; that is, the new judgment itself.  Specifically, the appeal challenged whether a portion of the sentence should run consecutively rather than concurrently.  (*Rivera, supra*, 157 Cal.App.3d at p. 495.)  In contrast, here, the People challenge the superior court's conclusion that the People did not prove that Saibu was guilty of murder beyond a reasonable doubt, a decision that then required the court to vacate the murder conviction and resentence Saibu.  Thus, the People, in this instance, are challenging an order made after judgment, rather than the new judgment itself.  Thus, we

conclude the trial court's order finding defendant entitled to relief under section 1172.6 is appealable under section 1238, subdivision (a)(6).[9]

Additionally, we are not concerned that the People's appeal violates the double jeopardy clause of the United States and California Constitutions. The double jeopardy clause in the federal Constitution, as our high court has noted, uses "words very similar" to California's. (*People v. Hernandez* (1998) 19 Cal.4th 835, 842.) Under the federal clause, it is well settled that the government is free to appeal an adverse postverdict ruling by the trial court. (E.g., *United States v. DiFrancesco* (1980) 449 U.S. 117, 130; *United States v. Wilson* (1975) 420 U.S. 332, 344 (*Wilson*); accord, *People v. Hatch* (2000) 22 Cal.4th 260, 276 ["the United States Supreme Court has held that the double jeopardy clause only prohibits multiple trials and does not preclude appeals from postconviction rulings made by a trial court"].)  "[W]here there is no threat of either multiple punishment or successive prosecutions, the Double Jeopardy Clause is not offended." (*Wilson*, at p. 344.)  "These interests . . . do not apply in the case of a postverdict ruling of law by the trial judge. Correction of an error of law at that stage would not grant the prosecutor a new trial or subject the defendant to the harassment traditionally associated with multiple prosecutions. We therefore conclude that when a judge rules in favor of the defendant after a verdict of guilty has been entered by the trier of

---

[9]     Because we find the superior court's order appealable under section 1238, subdivision (a)(6), we do not consider the People's additional argument that the order is appealable under subdivision (a)(8) as well (which Saibu does not address).  Yet, the plain text of section 1238, subdivision (a)(8) certainly suggests that the People may appeal an order or judgment that dismisses or terminates any portion of any action. (See *Salgado*, *supra*, 88 Cal.App.4th at pp. 11-12.)  And by granting Saibu's petition below, the superior court dismissed the murder charge portion of the criminal action.

fact, the Government may appeal from that ruling without running afoul of the Double Jeopardy Clause." (*Id.* at pp. 352-353.)

There is no reported case wherein the California Supreme Court has addressed the double jeopardy argument Saibu advances here. Where the issue has not been "firmly settled" under state constitutional law (*People v. Hanson* (2000) 23 Cal.4th 355, 364), " 'cogent reasons must exist before a state court in construing a provision of the state Constitution will depart from the construction placed by the Supreme Court of the United States on a similar provision in the federal Constitution.' " (*Raven v. Deukmejian* (1990) 52 Cal.3d 336, 353.) Here, we do not find any sound reason to depart from federal guidance on double jeopardy.

The state and federal double jeopardy provisions not only use similar language but also target the same evils—successive prosecutions and multiple punishments. (*People v. Bright* (1996) 12 Cal.4th 652, 660.) Here, if the People's appeal is successful, Saibu is not subject to multiple punishments. In fact, at most, if this court reversed the superior court's order and the superior court considered the evidence again and found the People had carried their burden under section 1172.6, the result would only be that the court would affirm the jury's verdict finding Saibu guilty of murder. (Cf. *Wilson, supra,* 420 U.S. at pp. 344-345 ["Since reversal on appeal would merely reinstate the jury's verdict, review of such an order does not offend the policy against multiple prosecutions"].) Nevertheless, relying on *People v. Jones* (2020) 56 Cal.App.5th 474, review granted, January 27, 2021, S265854 (*Jones*), and *People v. Allison* (2020) 55 Cal.App.5th 449 (*Allison*), Saibu characterizes an evidentiary hearing under section 1172.6 as a bench trial and, more importantly, argues that the superior court, as the

trier of fact, acquitted him. Saibu's reliance on *Jones* and *Allison* is misplaced.

Saibu relies on the concurring opinion in *Jones*, *supra*, 56 Cal.App.5th at page 490 (conc. opn. of Menetrez, J.), review granted, for the proposition that an evidentiary hearing under section 1172.6 is akin to a bench trial. However, putting aside that the portion of the opinion on which Saibu relies is the concurrence, we observe that the appellate court in *Jones* was not asked to determine whether a section 1172.6 evidentiary hearing should be considered a bench trial. Rather, Justice Menetrez criticized the reasoning of *People v. Torres* (2020) 46 Cal.App.5th 1168, review granted June 24, 2020, S262011, and *People v. York* (2020) 54 Cal.App.5th 250, review granted November 18, 2020, S264954, to the extent those cases treated differently the preclusive effect of a pre-*Banks/Clark* special circumstances finding from the preclusive effect of a post-*Banks/Clark* finding. Further, Justice Menetrez lamented the possibility that "every convicted murderer who could make a prima facie showing (whatever that might be) that the prior findings were factually incorrect would be entitled to a bench trial de novo on those filings." (*Jones*, at p. 490 (conc. opn. of Menetrez, J.), review granted.) So, Justice Menetrez was not focused on whether the evidentiary hearing was a bench trial, but instead, he concluded that section 1172.6 should not be a vehicle to allow a defendant to challenge previous factual findings of the jury.

Similarly, *Allison*, *supra*, 55 Cal.App.5th 449 also is not helpful to Saibu. There, the appellate court affirmed the superior court's finding that the defendant was not eligible for resentencing under section 1172.6 because his admission of felony-murder special circumstances. (*Allison*, at p. 457.) The court determined that the defendant had not made a prima facie showing that he was entitled to relief under section 1172.6. Therefore, the court did

31

not hold an evidentiary hearing. In affirming the superior court's conclusion, the appellate court borrowed some of the same language Justice Menetrez used in his concurrence in *Jones*. (Compare *Allison*, at p. 461 ["Thus, every convicted murderer who could make a prima facie showing (whatever that might be) that the prior findings were factually incorrect would be entitled to a bench trial de novo on those findings"] with *Jones*, *supra*, 56 Cal.App.5th at page 490 (conc. opn. of Menetrez, J.) [same], review granted.) As such, the appellate court's mention of a bench trial in passing is not instructive here.

Indeed, Saibu does not discuss the language of section 1172.6 to support his claim that the evidentiary hearing is a bench trial. Nowhere in the statute is a bench trial mentioned. Rather, section 1172.6, subdivisions (d)(1) and (3) explicitly refer to the superior court holding an evidentiary hearing. Further, as we explained *ante*, the evidentiary hearing/bench trial distinction is not important when we consider that if the People are successful in their appeal here, Saibu will not be subject to double jeopardy. Simply put, the People's successful appeal will not subject Saibu to another jury trial.

Although it is well settled that the People may not appeal after a jury acquits a defendant (*People v. Eroshevich* (2014) 60 Cal.4th 583, 588 (*Eroshevich*)), the appeal before us does not involve any such challenge. Here, the superior court's dismissal of the murder charge occurred long after the jury's verdict. The jury convicted Saibu of murder on March 13, 2009. On January 4, 2011, we upheld the conviction on appeal. (*People v. Saibu*, *supra*, 191 Cal.App.4th at p. 1014.) On November 18, 2019, following the passage of Senate Bill 1437 and after holding a section 1172.6 evidentiary hearing, the superior court granted Saibu's petition for relief and vacated the murder conviction. In doing so, the superior court determined the evidence

did not prove beyond a reasonable doubt that Saibu could still be convicted of murder under the amendments to section 189. Such an order is appealable because "if a trial court rules that evidence was insufficient to support a conviction *after the jury has returned a verdict* the People may appeal that ruling 'because reversal would result in reinstatement of the jury verdict of guilt, not a new trial.'" (*Eroshevich*, at p. 590, quoting *Evans v. Michigan* (2013) 568 U.S. 313, 330, fn. 9.) In short, because appellate review of the postverdict ruling presented no threat of multiple punishment or successive prosecutions, the double jeopardy clause is not offended. (*Statum*, *supra*, 28 Cal.4th at pp. 693-694; *Eroshevich*, at p. 590.)

Moreover, Saibu's reliance on *Monge v. California* (1998) 524 U.S. 721, and its progeny, is misplaced. *Monge* established that where an "appeals court overturns a conviction on the ground that the prosecution proffered insufficient evidence of guilt, that finding is comparable to an acquittal, and the Double Jeopardy Clause precludes a second trial." (*Id.* at p. 729.) Although this principle is correct, the rationale is based on the greater interest in preventing a second trial when, on review, it is decided as a matter of law that the jury could not properly have returned a verdict of guilty. (*Burks v. United States* (1978) 437 U.S. 1, 16.) Essentially, where an appellate court overturns a conviction for lack of sufficient evidence proving guilt, the prosecution had been given one fair opportunity to offer what proof it could assemble and thus, should not be afforded another chance when its evidence was insufficient as a matter of law. This reasoning comports with the protection afforded by the double jeopardy clause. This rule has no application to this case because, here, a trial court dismissed Saibu's murder charge following a valid guilty verdict. Further, the People claim to be

33

appealing a legal error, not challenging the evidence that was before the superior court.

Against this backdrop, we conclude that the present appeal does not violate the double jeopardy clauses of the United States or California Constitutions.

## C. *Saibu's Petition for Resentencing*

### 1. *The People's Contentions*

Under section 1172.6, subdivision (d)(3), the superior court acts as an independent fact finder and determines whether the People have met their burden in proving the defendant guilty of murder under the revised felony murder law. (See *People v. Ramirez* (2021) 71 Cal.App.5th 970, 984; § 1172.6, subd. (d)(3).) Here, the superior court concluded that the People did not carry their burden and granted Saibu his requested relief. The People maintain the court did not apply the correct legal standard at the section 1172.6 evidentiary hearing and, thus, failed to consider all of the relevant evidence. Further, they assert had the court applied the correct legal standards as outlined in *Banks*, *supra*, 61 Cal.4th 788 and *Clark*, *supra*, 63 Cal.4th 522, then it would have found the People had proved beyond a reasonable doubt that Saibu was a major participant and acted with reckless indifference to human life, sufficient to deny Saibu's petition for resentencing. As we discuss *post*, the People cannot show legal error on the record before us.

### 2. *The Relevant Law*

It is undisputed that Saibu was not the actual killer in the instant action. Instead, he was convicted under the natural and probable causes doctrine or the felony murder rule. After Senate Bill 1437 changed the law as to what needed to be proven to convict a defendant under felony murder, the parties agree that the essential question before the superior court during the

section 1172.6 evidentiary hearing was whether Saibu was a major participant in the underlying robbery who acted with reckless indifference to human life. (See § 189, subd. (e)(3).) Accordingly, we briefly discuss the current status of the felony murder rule in California.

The United States Supreme Court has addressed the degree of conduct and mental state required to impose the death penalty on non-killers convicted of murder under a felony murder theory. *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) and *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*), "collectively place conduct on a spectrum, with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions." (*Banks*, *supra*, 61 Cal.4th at p. 794.)

*Enmund* lies at one end of the spectrum. Although the defendant in that case identified a robbery victim, drove armed confederates to the victim's house, acted as a getaway driver, and helped dispose of the weapons, the court determined him ineligible for the death penalty because he did " 'not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed.' " (*Banks*, *supra*, 61 Cal.4th at p. 799, quoting *Enmund*, *supra*, 458 U.S. at p. 797.)

*Tison* lies at the other end of the spectrum. There, the Supreme Court considered whether the death penalty could be imposed on two brothers who broke their father and his cellmate out of prison using numerous weapons and then, in their ensuing escape, carjacked and robbed a family that their cohorts ultimately killed. (See *Tison*, *supra*, 481 U.S. at pp. 138-142.) The court concluded that the brothers constitutionally could be subject to the death penalty because their "major participation in the felony committed,

35

combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." (*Id*. at p. 158.)

Tison's holding was directly incorporated into section 190.2, subdivision (d), which governs special circumstance murder and was incorporated into section 189, subdivision (e)(3) by Senate Bill 1437. Accordingly, "the standard under section 189, subdivision (e)(3) for holding . . . a defendant [who was not the actual killer] liable for felony murder is the same as the standard for finding a special circumstance under section 190.2(d), as the former provision expressly incorporates the latter." (*In re Taylor* (2019) 34 Cal.App.5th 543, 561.)

Our high court has clarified that *Enmund* and *Tison* "establish that a defendant's personal involvement [in the crimes] must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder such as Earl Enmund." (*Banks*, *supra*, 61 Cal.4th at p. 802.) That is, he or she must have been a "major participant" in the crime, under the totality of the circumstances. (*Id.* at p. 803.) In *Banks*, the court identified several considerations relevant to the major participant inquiry: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Id.* at p. 803.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the

defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' " (*Ibid*.)

To determine whether a defendant acted with reckless indifference to human life, we "look to whether a defendant has ' "knowingly engag[ed] in criminal activities known to carry a grave risk of death." ' [Citations.]" (*Banks*, *supra*, 61 Cal.4th at p. 801.) "The defendant must be aware of and willingly involved in the violent manner in which a particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Ibid*.) A defendant's degree of participation in the crime also can affect the reckless indifference inquiry; "the greater the defendant's participation in the felony murder, the more likely that he [or she] acted with reckless indifference to human life." (*Tison*, *supra*, 481 U.S. at p. 153.) Although "there are some felonies as to which one could properly conclude that any major participant necessarily exhibits reckless indifference to the value of human life," such as " 'the manufacture and planting of a live bomb,' " armed robbery is not among them. (*Clark*, *supra*, 63 Cal.4th at p. 615, quoting *Banks*, *supra*, 61 Cal.4th at p. 810, fn. 9.)

In *Clark*, *supra*, 63 Cal.4th at pages 618 through 622, the California Supreme Court established a five-factor test for whether a defendant acted with reckless indifference to human life. As with the factors relevant to major participation, no one factor is necessary, nor is any necessarily sufficient. The first factor is the defendant's knowledge of weapons, and use and number of weapons. (*Id*. at p. 618.) "The mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life." (*Ibid*.) However, it may be "significant" if a defendant personally uses a weapon during the crime. (*Ibid*.) The second factor is whether the defendant was physically present at the crime scene and

37

whether he or she had opportunities to limit the crime or aid the victim(s). (*Id*. at p. 619.) A defendant's presence may be particularly significant where "the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force." (*Ibid*.) The third factor is the duration of the felony; crimes of longer duration present greater risk of violence and therefore evince more reckless indifference. (*Id*. at p. 620.) "Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Ibid*.) The fourth factor is the defendant's knowledge of his or her coparticipants' likelihood of killing. (*Id*. at p. 621.) A defendant who knows a coparticipant previously has used lethal force is more culpable than one unaware of a coparticipant's propensity for violence. (*Ibid*.) The fifth factor is whether the defendant made any efforts to minimize the risk of violence. (*Ibid*.) Such efforts may include planning the crime to occur at a time or location where bystanders are unlikely to be present, or using unloaded or minimally loaded firearms. (See *id*. at pp. 621-622.)

Both the "magnitude of the objective risk of lethal violence and a defendant's subjective awareness of that risk" are relevant to the reckless indifference inquiry. (*Clark*, *supra*, 63 Cal.4th at p. 623.) "Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient" to demonstrate reckless indifference to human life. Instead, "knowingly creating a 'grave risk of death' " is necessary to establish the requisite mindset. (*Banks*, *supra*, 61 Cal.4th at p. 808.) " '[T]he fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human

life." (*In re Scoggins* (2020) 9 Cal.5th 667, 677, quoting *Banks*, at p. 808.) "The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed," and must then consciously disregard "the significant risk of death his or her actions create." (*Banks*, at p. 801.)

### 3. *Analysis*

The People's primary argument is that the court did not properly evaluate the evidence under the *Clark* and *Banks* factors but rather used "a mental intent legal standard more akin to the malice standard described in section 188."[10] In support of their position, the People point to the court's comments that it could not impute Valentino's intent and purpose to kill onto Saibu. They insist these comments indicate that the court was focused on Valentino's malice and whether the evidence showed Saibu shared in that intent. In other words, the People maintain that these comments make clear that the court evaluated the evidence through the requirements of section 188 and not section 189, subdivision (e)(3), as was required under California's felony murder rule.

At first blush, we too find the court's comments regarding imputing Valentino's intent onto Saibu somewhat out of place because the People do not appear to have argued that Valentino's intent could be imputed onto Saibu. Indeed, at the section 1172.6 evidentiary hearing, both parties focused on the factors under *Clark* and *Banks* and argued that these factors favored their respective positions. And the court indicated an understanding

---

10    Section 188 discusses murder liability under a malice aforethought theory: "[I]n order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).) Section 189, subdivision (e), i.e., the felony-murder rule, is an exception to the malice requirement listed in section 188. (See § 188, subd. (a)(3).)

39

that the parties were discussing where Saibu's actions fit on the "*Tison* Continuum," noting that it must "ultimately assess[ ] culpability for murder on the part of somebody who didn't actually kill."  Further, the court observed there were two ways to do so:  through direct aiding and abetting, "which requires a shared intent and a shared purpose, and the felony murder rule[,] [which] historically does not."  In this context, the court's comment that it could not impute Valentino's mental state onto Saibu is legally correct and does not appear to indicate that the court was applying the wrong legal standard to the evidence but rather was simply working through the evidence on the record, in real time, perhaps a bit inartfully.  For example, the court discussed its reasoning regarding Saibu's mental state and the evidence involving the same as follows:

> "And I think that the question of [Saibu's] reckless indifference must focus on the circumstances of this robbery.  It is not a question of whether he intended a robbery would occur.  I think he did.  He helped steal the car, I think, and drove them there and was waiting outside and all the other factors that [the People] cite[ ].

> "But in terms of his actions, we have to look at his actions as to what he did in this particular robbery.  And I think that the inferences, with due respect, [The People] draw[ ] are too broad in terms of imputing Mr. Valentino's intent and conduct and reckless indifference and indeed, I think, intent to kill when things went bad.

> "We can't impute all that to Mr. Saibu.  I understand they were friends.  I understand they have done a number of robberies together.  I understand the circumstances before and after.  But it goes beyond a reasonable inference and becomes speculation to impute all that to Mr. Saibu.

> "The question whether Mr. Saibu entertained the requisite mental state which must be that he knowingly engaged in criminal activities known to carry a grave risk of death.  He must be aware and willingly involved in the violent manner

40

in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death that his or her action create. And I don't find that to be the case with respect to Mr. Saibu with respect to this robbery."

The court's comments make clear, as the People concede, that it correctly stated the mental state of reckless indifference necessary to convict Saibu of murder under the felony murder rule. (See *Banks*, *supra*, 61 Cal.4th at p. 801.) Further, the court accurately stated that it could not impute Valentino's intent onto Saibu. Although that comment might be unnecessary considering the parties' agreement that section 189, subdivision (e)(3) governs the instant matter, the fact that the court made the comment, by itself, is not enough to persuade us that it was applying the wrong legal standard to the evidence. Our conclusion is buttressed by the court's discussion of and explicit reference to "the whole mix of factors" under *Banks* and *Clark* that it stated must be "look[ed] at."

In addition, the People take issue with the superior court's conclusion that Saibu did not intend to set in motion a robbery that was substantially more dangerous than a typical *armed* robbery. They contend the court improperly considered the underlying felony conduct as an armed robbery, not just a robbery. As such, the People maintain that the court's use "of the arming factor as part of the underlying felony diminished its relevance to the question whether or not the robbery was more dangerous due to the presence of a weapon." Moreover, the People argue the court's framing of the underlying felony as "armed robbery" caused the court to "essentially ignore[ ]" the existence of a weapon and that "Saibu personally procured the weapon" in evaluating the existence of reckless indifference. We reject these contentions.

41

The court did not ignore the fact that Valentino entered the liquor store with a firearm. Indeed, the court noted that Saibu "may have helped procure" the gun. Moreover, the court's statement that it was "not able to accept the inference that Mr. Saibu intended to set in motion a robbery that was substantially more dangerous than the typical armed robbery" does not indicate to us that the court ignored the importance of the gun in the underlying murder or otherwise applied the incorrect legal standard to the evidence. Instead, the court's comments somewhat mirror similar language offered by our high court. (See *Clark*, *supra*, 63 Cal.4th at p. 618 ["The mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life"].)

The People also contend that the court's use of an improper legal standard caused it to exclude certain evidence. Specifically, the People find fault in the court's explanation it did not believe that Saibu's "role in other robberies where he was actively there at the scene of the robbery with a gun and doing the robbing" had "much relevance to this case where he wasn't there inside with the gun doing the robbing." The People thus assert these statements indicate that the court failed to consider "other significant and admissible evidence in its analysis of whether Saibu's conduct met the standards of major participant or reckless indifference." Alternatively stated, the People argue the court excluded evidence of Saibu's other robberies and attempted robberies at the section 1172.6 hearing. We disagree.

Evidence regarding Saibu's additional robberies and attempted robberies was admitted at his underlying trial. At the section 1172.6 evidentiary hearing, the People requested that the superior court admit, among other things, the reporter's transcripts from Saibu's trial. The court

42

did so. Those transcripts included the testimony about the additional robberies and attempted robberies. The court did not exclude the evidence.

Moreover, at the evidentiary hearing, both parties referred to the evidence of other robberies and attempted robberies, arguing that those events supported their respective positions. For example, the People emphasized "the totality of the circumstances" while asserting the court should consider that Saibu was involved in a series of robberies with each one involving Saibu arming himself or others to take money by force. They characterized Saibu as the "mastermind" behind the robberies and underscored that Saibu, the night before the murder, tried to rob the very liquor store in which Valentino ultimately killed the victim.

In response, Saibu's counsel argued that the robberies committed before and after the murder at the liquor store indicated that Saibu was not a major participant in the murder. Counsel highlighted the differences between the other robberies and the attempted robbery in which a victim was killed. Saibu's counsel also contrasted the planning of the robbery (including the stealing of a car and procuring of a firearm) with the "rash, impulsive, and unplanned" shooting of the victim. Finally, defense counsel maintained that Saibu had not committed any act of violence in any of the previous robberies or attempted robberies.

In response to the parties' respective arguments, the court commented that it did not find Saibu's role in those other robberies where he was actively involved and armed to have "much relevance" to the attempted robbery wherein Valentino shot the victim. The People argue we should interpret the court's comments as establishing that it excluded the evidence of the other robberies and attempted robberies. However, as we stated *ante*, the court admitted into evidence the entire trial record, which included evidence about

43

the additional robberies and attempted robberies.  In this context, it is apparent that the court was not making a legal ruling that the subject evidence was not relevant but rather, was using the word "relevance" in the colloquial sense of the word, meaning that it did not believe the evidence was significant.  In other words, the court admitted the evidence of other robberies and attempted robberies but did not give it much weight.  The court was well within its authority to do so because it was sitting as a finder of fact with the power to judge credibility, resolve conflicts, weigh evidence, and draw inferences.  (Cf. *People v. Needham* (2000) 79 Cal.App.4th 260, 265.)  The fact that the People disagree with the conclusions and inferences the superior court drew from the evidence does not mean the court utilized an incorrect legal standard to view the evidence.  Rather, it simply suggests that the People disagree with the court's factual finding.  Indeed, reasonable minds my differ in how evidence is viewed.  So, it does not matter that we may have reached a different finding than the superior court on the record before us.  An appellate court is rarely a finder of fact, and we are especially ill-suited here to substitute our evaluation of the evidence with that of the superior court (particularly where, as here, the same judge oversaw the underlying criminal trial and the section 1172.6 hearing).  (Cf. *People v. Snow* (2003) 30 Cal.4th 43, 66.)

In addition, the case law relied on by the People does not support their claim of legal error.  Instead, the cases the People cite each involve substantial evidence review of a jury verdict of murder wherein the jury found the defendant was a major participant in the underlying felony and acted with reckless indifference to human life.  (See *People v. Williams* (2015) 61 Cal.4th 1244, 1281-1282; *In re McDowell* (2020) 55 Cal.App.5th 999, 1011-1015; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1089-1091.)  These

cases would be helpful to the People had the court found they carried their burden of proving Saibu was guilty of murder under section 189, subdivision (e)(3). But that is not the issue before us. And these cases do not stand for the proposition that the superior court committed legal error in evaluating the evidence at the section 1172.6 evidentiary hearing.

Finally, in their reply brief, the People urge us to follow the recently decided *People v. Rodriguez* (2021) 66 Cal.App.5th 749 (*Rodriguez*), which the People claim "is directly analogous to the present case and supports the People's argument." In that case, Rodriguez committed a series of armed robberies with his codefendant Gamboa and, during one of the robberies, a victim was shot and killed at a tire shop. (*Id.* at pp. 757-761.) Gamboa was the actual robber and killer during the attempted robbery where the murder occurred while Rodriguez sat outside of the shop as the getaway driver. (*Id.* at p. 758.) In challenging the jury's robbery murder special circumstances finding, Rodriguez argued the evidence was insufficient to prove he was a major participant who acted with reckless indifference to human life. (*Id.* at p. 765.)

In concluding that substantial evidence supported the jury's special finding, the court observed that it was appropriate to look at the totality of the circumstances, which included not only the attempted robbery in which Rodriguez was the getaway driver but the facts surrounding Rodriguez and Gamboa's "crime spree, in particular the events leading up to the murder [at the tire shop], as well as the events that took place thereafter." (*Rodriguez, supra*, 66 Cal.App.5th at p. 768.) The appellate court then noted that Rodriguez and Gamboa engaged in a series of armed robberies over a period of two days, and, before the tire shop murder, Rodriguez had shot someone in the head during one of the additional robberies. (*Id.* at p. 769.)

45

The People urge us to apply *Rodriguez*, *supra*, 66 Cal.App.5th 749 to the instant action and find the superior court committed legal error. We decline to do so. Again, like the other cases the People rely on, *Rodriguez* is a substantial evidence case, affirming the jury's finding that a defendant was a major participant who acted with reckless indifference to human life. Here, the court, as the fact finder, came to the opposite conclusion as to Saibu. Thus, *Rodriguez* is of limited application to the instant action.

Moreover, the court here did consider the evidence of additional robberies and attempted robberies during the section 1172.6 hearing. However, it simply did not ascribe much weight to that evidence. Nothing in *Rodriguez* mandates the amount of weight a fact finder must give certain evidence, even if that evidence involves a crime spree.

Finally, the facts in *Rodriguez*, *supra*, 66 Cal.App.5th 749 are more severe than the facts of the instant action. Less than three hours before Gamboa shot and killed the victim, Rodriguez shot someone during an attempted robbery. (*Id.* at p.769.) In contrast, there is no evidence that Saibu harmed anyone during the additional or attempted robberies (a fact emphasized by the superior court). Moreover, unlike Rodriguez who shot a person who resisted during a robbery, Saibu was disarmed and fled the scene when he faced resistance during his attempted robbery of the liquor store the night before the murder.

In summary, on the record before us, the People have not shown that the superior court committed legal error. The parties briefed and argued about the factors in *Banks* and *Clark* during the evidentiary hearing. The superior court noted the *Banks* and *Clark* factors and correctly articulated the current California felony murder rule. The court simply made certain

46

factual findings with which the People disagree.  And the People do not make a substantial evidence challenge here.  As such, the order is affirmed.[11]

### D.  *Attempted Murder*

The jury convicted Saibu of three crimes based on the attempted robbery of the liquor store on or about July 13, 2005:  murder, attempted murder, and attempted robbery.  Saibu's petition for resentencing under section 1172.6 primarily addressed his murder conviction.  During the evidentiary hearing, the superior court discussed the validity of the attempted murder charge because it believed it was "pretty clear" that "there was no direct aiding and abetting, and that was a natural and probable consequence and theory."  However, the court explicitly stated it was not going to address the issue:  "I'm not going to reach that question as to whether the Court should, as well, address the attempted murder natural and probable consequences doctrine.  The People haven't had a chance to fully address that, in my view, and I think I would be making an untoward

_____

[11]    Additionally, we disagree with the People's argument that the superior court's failure to make a determination whether Saibu was a major participant somehow undermines the court's factual finding that the People did not prove Saibu acted with reckless indifference.  We observe that our high court engaged in a similar analysis in *Clark*:  "We need not decide whether defendant was a major participant under the circumstances of this case because, as we conclude below, the evidence was insufficient to uphold a finding that defendant acted with reckless indifference to human life." (*Clark*, *supra*, 63 Cal.4th at p. 611; see *In re Taylor*, *supra*, 34 Cal.App.5th at p. 557 [no need to address major participant evidence because insufficient evidence defendant acted with reckless indifference]; *In re Miller* (2017) 14 Cal.App.5th 960, 974-975 [same].)  Simply put, a finding that a defendant is a major participant does not mandate a finding that the defendant also acted with reckless indifference.  Again, it appears that the People's argument is focused on how the superior court weighed the evidence, not on any legal error.

47

reach."[12]  Further, at that time, there was some debate whether former section 1170.95 applied to the offense of attempted murder.  Senate Bill 775 changed that.

Senate Bill 775 was signed into law on October 5, 2021, and expanded the petition process under former section 1170.95 to include individuals convicted of "attempted murder under the natural and probable consequences doctrine." (Legis. Counsel's Digest, Sen. Bill No. 775 (2021-2022 Reg. Sess.).) Senate Bill 775 "clarifies" that "persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural [and] probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories."  (Stats. 2021, ch. 551, § 1, subd. (a).)  To this end, Senate Bill 775 amended former section 1170.95, effective January 1, 2022, to provide:  "A person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter may file a petition with the court that sentenced the petitioner to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts . . . ."  (former § 1170.95, subd. (a), as amended by Stats. 2021, ch. 551, § 2, eff. Jan. 1, 2022; see § 1172.6, subd. (a).)

In their supplemental briefs, the parties agree that Saibu's conviction for attempted murder is now eligible for resentencing pursuant to Senate Bill 775.  However, they disagree what should occur next as to that offense.

---

[12]   Saibu's counsel did not appear to disagree with the superior court and indicated that she included the argument in the brief for the evidentiary hearing in an abundance of caution to avoid waiver.

Saibu argues we should apply the superior court's reasoning regarding the murder offense to the attempted murder count to find that the record is insufficient to prove Saibu directly aided and abetted the attempted murder: "[I]t strains credulity to believe that any judge would find, under the facts of this case, that Mr. Saibu intended that Valentino kill [W.Y.] but not that he kill [D.T.]"

In contrast, the People argue there is evidence in the record on which the superior court could find Saibu was convicted under a valid theory for attempted murder. Although much of the evidence seems similar to what the People put forth in the previous evidentiary hearing on the murder count, the People emphasize that, at the previous hearing, they did not discuss the testimony of W.Y., the victim of the attempted murder. And, from our review of the record, it does not appear that the superior court focused on or even considered W.Y.'s testimony in making its finding that Saibu was entitled to relief on the murder count.

Further, attempted murder and murder are different crimes and have different victims. Accordingly, we believe the prudent course is to remand this matter back to the superior court to issue an OSC and hold an evidentiary hearing regarding whether Saibu is entitled to resentencing under section 1172.6 as to the attempted murder count. It may be that the People face an uphill battle considering the superior court's finding on the murder count (which we affirm), but we agree with the People that they should have the opportunity to make their arguments to the fact finder and emphasize specific evidence (like W.Y.'s testimony) pertinent to the attempted murder count, which they did not do in the previous hearing.

## DISPOSITION

The order is affirmed.  However, in light of Senate Bill 775, which came into effect during the pendency of this appeal, we remand this matter to the superior court to issue an OSC and hold an evidentiary hearing regarding whether Saibu is entitled to resentencing under section 1172.6 on the attempted murder conviction.  We offer no opinion concerning the outcome of that hearing.  Nonetheless, on remand, the People may not revisit the previous order of the superior court that Saibu is entitled to resentencing under section 1172.6 for his murder conviction or otherwise argue that the superior erred in reaching that conclusion.

HUFFMAN, Acting P. J.

WE CONCUR:


O'ROURKE, J.



DO, J.

50